**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **BARRETTE OUTDOOR LIVING, INC.,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Case No. 1:19-cv-03027-SAG** |
| | * | |
| **IRON WORLD MANUFACTURING, LLC,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Barrette Outdoor Living, Inc. ("Barrette") sued Iron World Manufacturing, LLC ("Iron World") for patent infringement. Pending is claim construction for the disputed terms of U.S. Patent Nos. 8,413,965 ("the '965 patent"); 8,413,332 ("the '332 patent"); and 9,151,075 ("the '075 patent") (collectively, the "Asserted Patents"). On June 7, 2021, the Court held a claim construction hearing. For the following reasons, the claim constructions adopted by the Court will govern this litigation.

### I.      BACKGROUND

Barrette is an Ohio corporation that specializes in the manufacture of fencing and railing products for residential and commercial applications. ECF 1 ¶¶ 2, 7. Barrette owns the Asserted Patents, which are directed to fence panels, their assembly, and a method for manufacturing them, and manufactures and sells products that use the patented inventions. *Id.* ¶¶ 8-12. According to Barrette, the fence panels described in the Asserted Patents have numerous advantages over traditional fence assemblies, including that they permit a substantial range of adjustment in the angle of installation (called "racking"), so that the fence panels can accommodate significant changes in terrain elevation. Barrette's invention purports to accomplish this wider racking range

1

by using a sliding connector strip instead of more traditional screws or bolts for linking the fence pickets to the rails.

A different court has already construed several terms in these patents and, in doing so, provided a useful overview of the technology at issue:

> The invention is best understood by reference to Figures 4 and 7C of the patents-in-suit. Figure 4 (below) illustrates a picket 20 that has a rail 30 placed over and around the picket. The rail is open on its bottom, so that a connector 34 can be placed along one or more pickets and then have the rail lowered over the connector so that it is held inside one vertical face of the rail by, for instance, a snap 32. The connector has bosses or protrusions 36 that fit within an opening 22 of the picket. The boss is round so that is can turn within the opening.



FIG. 4

> Figure 7C (below) illustrates the movement of the connector 34 within the rail 30. The picket 20 is inserted through an opening 39 in the rail of limited width relative to the width of the picket. Thus, as the upper portion of the picket is moved relative to the rail in the direction Y, the lever effect of the picket against the opening of the rail causes the connector 34 to move in the direction X (i.e. slide) relative to the rail because the connector is connected to the picket by the boss 36, which rotates (i.e. pivots) within the opening 22 in the picket.



FIG. 7C

*Barrette Outdoor Living, Inc. v. Origin Point Brands, LLC*, No. 1:13-CV-1665-AT, 2014 WL 11930616, at *1 (N.D. Ga. June 17, 2014).

Iron World, meanwhile, is a Maryland limited liability company with its principal place of business in Laurel, Maryland. ECF 23 at 7. It is a decorative and ornamental fencing and gate manufacturer, specializing in iron fencing and custom fence designs. *Id.* Barrette alleges that Iron World has infringed Barrette's patents by manufacturing and selling infringing "hidden fastener" metal fence panels. ECF 47 at 2.

On January 1, 2021, the parties submitted a Joint Claim Construction statement. ECF 46. On February 17, 2021, the parties submitted their opening claim construction briefs. ECF 47, 48. On March 19, 2021, the parties filed their responsive claim construction briefs. ECF 49, 50. Iron World submitted a supplemental responsive brief on May 13, 2021, ECF 52, well after the deadline for briefing had passed. The Court declined to strike the belated filing, ECF 56, and instead allowed Barrette additional time to file its own supplemental response, ECF 59. A claim construction hearing was held on June 7, 2021.

## II.   LEGAL STANDARD

Claim construction is a question of law, to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). Specifically, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy." Therefore, "district courts are not . . . required to construe every limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). For instance, terms that are "commonplace" or that "a juror can easily use [ ] in her infringement fact-finding without further direction from the court" need not be construed because they "are neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution history."

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted), cert. denied, 546 U.S. 1170 (2006). Thus, unsurprisingly, "the claim construction analysis must begin and remain centered on the claim language itself." *Id.* A court should give the term's words their "ordinary and customary meaning" as would be understood by "a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. "A determination that a claim term . . . has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro*, 521 F.3d at 1361.

In addition to the plain language of the claim itself, "the claim should be read within the context of the entire patent, including the specification." *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., Inc.*, 2009 WL 6898404, at *1 (D. Md. Mar. 20, 2009). The specification "is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Yet, in other Federal Circuit decisions, the specification's use has been limited to circumstances in which either "a patentee sets out a definition and acts as his own lexicographer," or "when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016). To this end, the Federal Circuit has "acknowledge[d] the difficulty in drawing the fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims." *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019), cert. denied, 140 S. Ct. 648 (2019). Through close review of the specification, "[m]uch of the time . . . it will become clear whether the patentee is

setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Phillips*, 415 F.3d 1323. To that end, for the specification language to restrict the scope of claim term, it must "rise to the level of 'a clear and unmistakable disclaimer.'" *Cont'l Circuits*, 915 F.3d at 797 (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012)).

"In addition to consulting the specification ... a court should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317 (internal quotation marks omitted). "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." S*outhwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995), cert. denied, 516 U.S. 987 (1995). "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

### III.    ANALYSIS OF THE DISPUTED TERMS

#### a.  Term 1

| Claim Term | Barrette's proposed construction | Iron World's proposed construction |
|---|---|---|
| "connector(s)" | "a linking structure that connects one item to another." | "a linking structure, such as a fastener or a screw, that connects one item to another." |

While the parties initially disagreed over the meaning of this term, Iron World ultimately conceded this issue and "agree[d] to Plaintiff's proposed definition." ECF 50 at 8. Accordingly, the Court will adopt Barrette's construction of "connector(s)."

### b.  Term 2

| Claim Term | Barrette's proposed construction | Iron World's proposed construction |
|---|---|---|
| "slide" | "to move with a smooth continuous motion" | "to move with a smooth continuous motion in a transverse direction at least a distance that is the width of a picket opening" |

While the parties agree that "slide" means, at least in part, "to move with a smooth continuous motion," Iron World seeks to impose additional direction and distance limitations in this construction.  It primarily relies on the specification to support its proposed limitation.[1]  In particular, it points to several figures listed in the specification that it suggests show the connector strip sliding a distance that is at least the width of the picket opening.  ECF 48 at 14.  This required sliding distance allegedly drawn from the specification is critical, in Iron World's view, because it distinguishes Barrette's invention from prior art by clearly demonstrating the fact that the patents in question do not "allow minute movements in any direction to qualify as sliding. . . ."  *Id.* at 15. To this end, Iron World points to Barrette's own description of prior art as involving sliding where there is "little if any horizontal movement," and suggests that therefore its limitation must be read into the claim term construction to avoid this overlap in scope.  ECF 50 at 13.  Relatedly, Iron World points to the prosecution history of the patents and suggests that, as part of the process of obtaining the patents, Barrette disclaimed its proposed meaning of the term "slide" by contrasting it with prior art in order to satisfy the patent examiner's concerns.  ECF 52.  Lastly, Iron World challenges the asserted patents' validity for failing to meet the written description and enablement requirements, regardless of which proposed construction of "slide" is adopted.  ECF 48 at 20-21.

---

[1] Unless otherwise noted, all references to the specification refer to the '965 patent specification, ECF 48 at 25-35.  The specifications for the '332 patent, ECF 48 at 37-47, and the '075 patent, ECF 48 at 49-60, are substantively similar in most ways relevant to this analysis.

Each of these rationales for limiting the meaning of "slide" falls short, particularly given that any disavowal appearing in the specification or prosecution history must be "clear and unmistakable" and that Iron World bears the burden of proving such clear disclaimer. *See Massachusetts Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016). First, the figures so heavily relied upon by Iron World as evidence of the direction and distance limitations are very explicitly meant to be exemplary. *See, e.g.*, ECF 48 at 34 ("The amount of rotation depicted in Figs. 7C-7D is meant to be exemplary of the capabilities of the present invention and is in no way meant to limit the scope of the present invention."); *see also Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). Moreover, even if the figures were not so clearly exemplary, Iron World's interpretation of their depictions is grounded solely in rough estimations and assumptions, as opposed to any sort of concrete, calculable data. *See* ECF 48 at 15 (describing how a person of ordinary skill in the art would, allegedly, make assumptions based off of the scaling of certain parts of the figures to interpret other distances depicted). This sort of "eyeballing" and subsequent extrapolation, drawn from explicitly exemplary images, is a far cry from the requisite *clear and unmistakable* disclaimer that must exist for any limitation to be read into the claim term from the specification. *See Cont'l Circuits*, 915 F.3d at 797.

The parties agree that "minute" movements are not covered by the Asserted Patents. *See* ECF 48 at 15; ECF 49 at 5. This is perhaps unsurprising given that the specification clearly distinguishes the claimed invention from prior art that permits only minute movements. *E.g.*, ECF 48 at 34 (explicitly contrasting the patented technology at issue from "prior art railing assembly . . . [that] only allow for a limited range of rotation and little if any horizontal movement"). That

said, the fact that "minute" movements are not covered fails to define a non-minute movement as being "at least the width of a picket opening."  Put differently, language in the specification suggesting that a fence assembly allowing for little if any horizontal movement is not covered by the Asserted Patents does not go so far as to support the particular distance limitation concocted by Iron World.

Furthermore, Iron World overlooks language elsewhere in two of the patents that makes clear that "minute" movements are not covered and in fact specifies minimum "pivotal ranges" of picket rotation, such that including such a limitation in the construction of "slide" is unnecessary. The '965 and '075 patents include numerous different claims requiring varying degrees of pivotal range, from at least about 20 degrees in each direction to at least about 35 degrees in each direction. *See* ECF 48 at 34-35; ECF 48 at 46-47.  Iron World's proposed definition of "slide" would inappropriately render these varying pivotal range degrees superfluous, because it would require *all* versions of the fence to have a pivotal range of at least the width of the picket opening, leaving no room for the sort of more moderate variation in degrees articulated by the '965 and '075 claims. *See Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1329-30 (Fed. Cir. 2004) (counseling against constructions that render differences in meaning and scope of claims superfluous, since there is a presumption that each claim in a patent has a different scope).  Thus, at least as to those two patents, Iron World's limiting definition of "slide" is both 1) unnecessary in light of the fact that the claims already require that covered devices achieve various pivotal ranges greater that those shown in prior art[2] and 2) invalid in that it would violate the principle of claim differentiation.

───────────────

[2] Barrette repeatedly argues, in its briefing and at the *Markman* hearing, that the patents in question do not cover "minute" movements covered by prior art, specifically movements that would elicit up to about 15 degrees of pivotal range.  *See, e.g.*, ECF 49 at 5-6, ECF 59 at 5-6.  This is unsurprising, given that all three patent's specifications explicitly distinguish the claimed inventions from prior art on the basis of facilitating pivotal ranges in excess of 15 degrees.  ECF

In its supplemental briefing, Iron World points to the patents' prosecution history as other evidence supporting its construction.  But Iron World once again relies on an unsupported logical leap from the fact that minute sliding is not covered to the conclusion that all variation in sliding, other than that at least the width of a picket opening, has been disclaimed.  It is clear from Barrette's discussions with the patent examiner, just as it is from the patent claims and the specification addressed above, that the patents do not cover the "minute" or non-existent sliding outlined in prior art.  *See, e.g.*, ECF 59-4 at 9 ("Neither *Schall* nor *Culter* disclose or suggest any sliding motion of the connectors relative to the rails.").  Such limitations, again, are already addressed in the patent claims themselves.  Beyond that, however, Iron World can point to nothing in this history supporting its specific limitation of sliding "at least a distance that is the width of a picket opening."  As such, there is no support for its proposed construction.

Iron World's final argument is not so much an argument in favor of its interpretation of the term "slide" as it is an argument that the patents are invalid on the whole, regardless of how "slide" is interpreted.  Iron World expresses skepticism that it is possible to have a fence that "has both (1) pickets with a higher degree of rotation over prior art and (2) picket openings that are the same size as the prior art," and suggests that this would leave a person of ordinary skill in the art of fence building unable to construct the fence.  ECF 48 at 20-21.  Iron World points to no evidentiary support for these arguments and instead relies on conclusory attorney argument.  As such, it is impossible for Iron World to satisfy the rigorous fact-based analysis as to whether the patent describes the invention "in sufficient detail that one skilled in the art can clearly conclude that 'the

---

48 at 34, 46, 58.  Thus, to the extent that Iron World is concerned that Barrette will reverse course and seek to include "minute" movements covered by prior art (i.e. movements that result in a pivotal range of only up to about 15 degrees) in these claims later in these proceedings, that avenue is foreclosed by the specifications and by Barrette's own arguments.

inventor invented the claimed invention,'" *Regents of the Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997), and whether "a patent enables one skilled in the art to make and use the claimed invention," *BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1371-72 (Fed. Cir. 2003).  It is telling, too, that another district court, construing these same patents, had little difficulty understanding the invention and how it is made, further undercutting Iron World's contention.  *See Barrette Outdoor Living, Inc.*, 2014 WL 11930616, at *1.[3]  Thus, Iron World's invalidity arguments are unpersuasive.

For all of the foregoing reasons, the Court will adopt Barrette's construction of the term "slide," omitting the additional limiting language proposed by Iron World.[4]

---

[3] This same court construed the term "slide" as "to go with a smooth continuous motion: glide," almost exactly mirroring Barrette's proposed construction here, providing further persuasive support for this construction.  *See Barrette Outdoor Living, Inc.*, 2014 WL 11930616, at *3.

[4] The parties focused the vast majority of their briefing and argument on the distance limitation in Iron World's proposed construction, and thus spent comparatively little time on arguing its directional component ("move in a transverse direction").  At the *Markman* hearing, Barrette acknowledged that the relevant sliding was, in fact, in a "transverse direction," such that Iron World's inclusion of that term here would be technically accurate.  Barrette suggested, however, that this directional component would be covered by Term 3 (the "whereby" clause, discussed below in Section III(c)), which specifies the direction in which the connector slides.  The Court agrees with Barrette that, while it is not incorrect to say that "sliding" occurs in a transverse direction, its inclusion in Term 2 is unnecessary given the directional component of Term 3.  Moreover, its inclusion would risk confusing the jury, given that the word "transverse" is in and of itself technical jargon.

### c.  Term 3

| Claim Term | Barrette's proposed construction | Iron World's proposed construction |
|---|---|---|
| "whereby pivoting the upper end of the respective picket towards the first end of the respective rail causes the respective connector to slide along the inner surface of the side wall of the respective rail towards the second end of the respective rail" | "the connector moves smoothly along the rail in one direction toward one end of the rail in response to an upper end of the picket pivoting toward the other end of the rail" | "the connector moves smoothly along the rail in one direction at least a distance that is the width of the picket opening toward one end of the rail in response to an upper end of the picket pivoting toward the other end of the rail" |

The parties' disagreement here mirrors, almost exactly, the preceding disagreement, since "slide" appears once again as the operative and contested word in this term.  Thus, the Court again adopts Barrette's proposed construction for the reasons outlined in Section III(b).

## IV.   CONCLUSION

For the foregoing reasons, the three terms as construed by the Court are as follows:

| Term | Court's Construction |
|---|---|
| "connector(s)" | "a linking structure that connects one item to another." |
| "slide" | "to move with a smooth continuous motion" |
| "whereby pivoting the upper end of the respective picket towards the first end of the respective rail causes the respective connector to slide along the inner surface of the side wall of the respective rail towards the second end of the respective rail" | "the connector moves smoothly along the rail in one direction toward one end of the rail in response to an upper end of the picket pivoting toward the other end of the rail" |

Dated:  June 11, 2020                                         /s/
                                                  Stephanie A. Gallagher
                                                  United States District Judge

11